IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 29, 2014

## KENNETH J. MEYER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bledsoe County**
**No. 552007       Thomas W. Graham, Judge**

---

**No. E2013-01033-CCA-R3-PC - Filed February 21, 2014**

---

The petitioner, Kenneth J. Meyer, appeals the denial of his petition for post-conviction relief from his 2008 Bledsoe County Circuit Court conviction of voluntary manslaughter, claiming that he was denied the effective assistance of trial counsel. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Andrew Love, Nashville, Tennessee (on appeal); and Theodore A. Engel, III, Dayton, Tennessee (at hearing), for the appellant, Kenneth J. Meyer.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Originally charged with second degree murder, the petitioner was convicted of voluntary manslaughter by a Bledsoe County Circuit Court jury, and the trial court imposed a sentence of 10 years' incarceration. This court affirmed the judgment on direct appeal. *See State v. Kenneth Meyer*, No. E2009-02294-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Nov. 16, 2010), *perm. app. denied* (Tenn. Apr. 13, 2011).

In *Kenneth Meyer*, this court summarized the facts of the case as follows:

> This case relates to an altercation between the [petitioner]
> and Frank Vestal in which the [petitioner] shot Mr. Vestal, who

died from his wounds. At trial, the victim's girlfriend, Patricia Mudica, testified that she and Mr. Vestal shared a home on Raccoon Ridge Road. She said that the victim drank five beers and took three pain pills on the day of the shooting. That evening, she and the victim went to the home of Kim Bailey, which was located next to the [petitioner's] home on Raccoon Ridge Road. Ms. Mudica said she and the victim left the Bailey home and drove to the [petitioner's] home to allow the victim to apologize to the [petitioner] for an incident that occurred two days earlier.

Ms. Mudica testified that they arrived at the [petitioner's] home between 11:00 p.m. and 11:30 p.m. She said that the [petitioner] lived in a motor home at the end of a gravel driveway and that their truck's headlights were the sole source of light in the area. She said the victim revved his engine twice in an attempt to get the [petitioner's] attention. She said the [petitioner] ran out of his home, completely nude, carrying a gun. She said the victim turned off the truck's headlights to prevent her from seeing the [petitioner] "running around naked." She said that she could not see what occurred afterwards due to the darkness but that the truck's windows were rolled down, enabling her to hear what occurred.

Ms. Mudica testified that after leaving his home, the [petitioner] yelled, "Who the f--- is it?" She said the victim identified himself and was told, "Get the f--- off my property." She said the victim agreed to leave the property. The [petitioner] again told the victim to leave, and the victim repeated that he would leave the property. Ms. Mudica then heard a gunshot. She heard the victim say, "Oh, f---," and heard a second gunshot a few moments later. She said she turned on the truck's headlights but was unable to see the victim or the [petitioner], who had returned to his home. She turned off the headlights when the [petitioner] then left his home because she was afraid the [petitioner] would shoot her. She said the [petitioner], now clothed, ran to the truck and began screaming and asking why she was there. She asked the [petitioner] where the victim was and was told that the victim was lying in the ditch, dead. Ms. Mudica said the [petitioner] threatened to shoot

-2-

her if she did not leave the property. She said the [petitioner] left, saying he was calling the police.

Ms. Mudica testified that she turned the truck lights on and ran to the victim. She attempted but was unable to move him because he was covered in blood. She said she returned to the truck, attempted to drive, and accidentally backed the truck into a tree. She said that the truck became disabled and that she ran away.

Ms. Mudica testified that neither she nor the victim possessed marijuana or a weapon when they went to the [petitioner's] home. She said she did not hear the victim threaten the [petitioner] before being shot.

*Kenneth Meyer*, slip op. at 1-2.

On cross-examination, Ms. Mudica admitted that the victim had consumed five beers and had taken three hydrocodone pills on the day of the shooting and that the victim did not have a prescription for the pills. *Id.* at 3. On redirect examination, Ms. Mudica estimated that, when she located the victim's body, it was five to six feet from the petitioner's motor home but testified that "this was just a guess." *Id.*

The victim's uncle, David Vestal, testified that he was with the victim at Ms. Bailey's residence on the evening of the shooting and that the victim was not in possession of marijuana that night, although he admitted that the victim had inquired as to whether anyone had any marijuana because the victim "wanted to 'smoke a joint.'" *Id.* Mr. Vestal testified that "no one at the Bailey home had any marijuana," and "he did not see the victim smoke marijuana that night." *Id.* Greg Gibson, who was also present at the Bailey home on the night of the shooting, testified that the victim did not have any marijuana that evening. *Id.*

Teletha Reed testified that she received the petitioner's 9-1-1 call on the night of the shooting, and the first six minutes of the petitioner's call were played for the jury. *Id.*

The tape reflects that the [petitioner] told Ms. Reed he was awakened by the victim, whom he asked to leave his property. The [petitioner] said the victim threatened his life and advanced on him, forcing him to shoot the victim. The [petitioner] stated that he was unsure if the victim had a weapon. The [petitioner]

-3-

also stated that he had been having problems with thieves breaking into his home. After the tape finished, Ms. Reed read from a transcript of later portions of the 9-1-1 call, noting that the [petitioner] stated, "Ma'am, I wish he wasn't dead . . . I hate the idea of having to go to prison over some f------ a------ like this . . . . Things are not fine. This is a nightmare."

*Id.*

Agent Mark Wilson with the Tennessee Bureau of Investigation ("TBI") testified that the victim's truck was discovered 106 feet from the victim's body and that law enforcement officers discovered a can of beer in the cup holder of the victim's truck but found no weapons or marijuana either in the truck or on the victim's body. *Id.* at 3-4. Agent Wilson noticed "a shotgun, four shell casings, and a bloody beer can near the victim's body." *Id.* at 3-4. With respect to the victim, Agent Wilson observed that he had sustained gunshot wounds to his chest, arm, and face and that he was covered in blood. *Id.* at 4. Agent Wilson testified that pools of blood were located at both the top and bottom of an embankment "with a trail of blood moving about halfway down the embankment," and the victim's body was discovered at the bottom of the embankment. *Id.* On cross-examination, Agent Wilson stated that a detective had measured the distance between the door of the petitioner's residence and the victim's body and had recorded the distance as "26" but failed to include the unit of measurement. *Id.* The detective had also recorded the distance between the pool of blood at the top of the embankment and the victim's head as "13.5," again without including a unit of measurement. *Id.*

TBI Agent Steve Scott testified that he had examined the petitioner's shotgun and determined that the shell casings recovered near the victim's body had been fired from that gun. *Id.* Forensic pathologist Doctor Adele Lewis testified that she performed the victim's autopsy and discovered that the victim had been "shot in the chest and arm, with pellets lodging in his chest, back, arms, and chin." *Id.* Doctor Lewis "removed shotgun wadding from the victim's arm," explaining that if "'you see wadding inside a shotgun wound, the distance from the . . . weapon to the person who has been shot is less than eight to ten feet.'" *Id.* Based on her examination of the victim, Doctor Lewis opined that the victim had been shot in the arm at a distance of eight feet and in the chest from a distance of two to four feet. *Id.* Blood tests on the victim's body revealed the presence of alcohol, marijuana, and valium but not hydrocodone. *Id.*

The petitioner testified that, on the night of the shooting, he was asleep by 8:00 p.m. because he had to wake up by 4:00 a.m. to prepare for work. *Id.* He was awakened that night by headlights, and he walked outside with his shotgun "'to be able to protect'" himself.

-4-

*Id.*

The [petitioner] testified that he heard the victim yell, "It's Frank, I have some marijuana I want to sell you." He replied that he did not want to purchase any and instructed the victim to leave. He said he attempted to load his shotgun when the victim left the truck, which he estimated was about forty feet from his home. The [petitioner] again told the victim to leave the property and loaded his shotgun. He said the victim continued to walk toward him despite being told to leave. He said the victim threatened him by stating that "he was going to get me when I come off my property, he was going to do me in . . . ." The [petitioner] said he was scared for his and his son's lives. Because it was dark, he was unable to tell if the victim was armed. He said that the victim took two more steps towards him and that he accidentally shot the victim. He said the victim charged at him and he again shot the victim. The victim fell to the ground, landing near the [petitioner's] feet. He said that the shooting was a reaction, not a conscious decision, and that he did not intend to kill the victim. He said he did not threaten Ms. Mudica before or after the shooting. The [petitioner] testified that he dropped the shotgun and called 9-1-1. He said he spoke with the 9-1-1 operator for about thirty minutes.

On cross-examination, the [petitioner] testified that he met the victim for the first time about one month before the shooting. He said that two nights before the shooting, the victim walked by his home between 11:30 p.m. and 12:00 a.m., causing the [petitioner's] dog to bark. The [petitioner] said he went outside, naked and armed with his shotgun, and saw the victim and his dog loitering in the [petitioner's] driveway. The victim told the [petitioner] he was out for a walk. The [petitioner] said that he told the victim not to come around his home in the middle of the night but that he did not threaten the victim. He said the victim replied that if his daughter had seen the [petitioner] naked, he would have to "do something" to the [petitioner]. The [petitioner] said that he did not consider the victim's statement to be a threat and that the victim continued on his walk.

The [petitioner] testified that the victim had not attempted to sell marijuana to him before the night of the shooting. He said he did not see the victim in possession of marijuana. He said that he rejected the victim's offer and that the victim threatened to harm the [petitioner] the next time the [petitioner] left his property. The [petitioner] agreed that the victim did not state that he had a weapon or that he was going to cause immediate harm to the [petitioner]. He said that the victim came toward him, despite seeing the shotgun in his hands, and that he accidentally shot the victim. He said he was unsure if the first shot hit the victim because it was dark. He said the victim charged him, forcing him to shoot the victim a second time in self-defense. The [petitioner] testified that he did not move during the encounter. He said he was five or six feet in front of his home when he shot the victim.

The [petitioner] testified that his home had been broken into. He said thieves stole a nine-millimeter pistol from his home.

*Id.* at 5.

On July 18, 2011, the petitioner filed, pro se, a petition for post-conviction relief. Following the appointment of counsel and the amendment of the petition, the post-conviction court held an evidentiary hearing.

The petitioner testified that trial counsel was appointed to represent him after the public defender requested to withdraw from the case, and trial counsel first met with the petitioner a few days after the appointment. The petitioner stated that trial counsel did not visit him again for nearly six months, finally appearing two weeks prior to the petitioner's trial. The petitioner testified that trial counsel told him he was "facing 60 years in prison" and that, less than 24 hours before trial, trial counsel informed him that the State "offered me involuntary manslaughter and five years." The petitioner stated that trial counsel did not mention parole eligibility or any lesser included offenses and that he simply told the petitioner that he had "until the morning" to decide.

Five days prior to the shooting, the petitioner was hit by a car and sustained injuries to his shoulders and one knee. The petitioner agreed that the injuries left him in a "very sore and weakened state" and that he was in no condition to defend himself. The petitioner testified that he informed trial counsel of his injuries but that trial counsel did not

introduce evidence of his injuries at trial.

With respect to the petitioner's knowledge of the victim, the petitioner testified that the victim had moved "down the street" approximately two to three months prior to the shooting. A few weeks before the shooting, law enforcement officers stopped the petitioner at a road block and asked him to open his trunk, informing him that they were searching for the victim. On another occasion, the victim stopped the petitioner on a road near their homes and asked the petitioner for a ride, explaining that "he had just run from the police . . ., run through the woods to get away from them." The petitioner stated that the victim had once indicated that if someone attempted to rob him or burglarize his home, the victim "would go to their house and take care of them." The petitioner testified that he knew the victim to be "a very dangerous man" but that trial counsel refused to address the victim's character, informing the petitioner that "if we use his character, they can use mine." The petitioner believed this statement to be a lie.

The petitioner testified that, just after the shooting occurred, he and his son were seated outside their house while the petitioner was on the phone with the 9-1-1 operator, waiting for law enforcement officers to arrive, when "a car drove by and started shooting at [them]."

On cross-examination, the petitioner testified, regarding the shooting of the victim, that "[w]hen that gun went off the first time, I was in fear for my life. And I was so scared I did not even realize I was pulling the trigger." The petitioner stated that "after the gun went off the first time, [the victim] said, shit, and he charged at me, and gave me no choice. And didn't have time to think about it." The petitioner stated that trial counsel "didn't bring out any witnesses on my behalf." The petitioner requested that trial counsel call Tommy Bacon as a witness, stating that Mr. Bacon would testify that friends of the victim had threatened the petitioner's life. The petitioner also requested that trial counsel have him evaluated by a psychiatrist who was not affiliated with a "State organization." When asked what evidence the petitioner had to prove the victim's violent tendencies, the petitioner merely responded that the victim "had warrants for his arrest" and "convictions for assault." When confronted with a motion in limine filed by the prosecutor prior to trial requesting that the trial court prevent the defense from addressing the victim's character, the petitioner responded, "That's illegal," and the petitioner stated that the prosecutor "cannot file a motion to prevent me from bringing that in."

On redirect examination, the petitioner explained that he was never given the opportunity at trial to express his opinion that the victim was a very dangerous man because "every time I'd . . . start to answer a question . . . they'd move on to something else before I could get the rest of my statements in."

On recross-examination, the petitioner admitted that he had only encountered the victim "two or three times" during the "month or so" before the shooting.

Keith Grant testified that he had been licensed to practice law since 2001 and that trial counsel had associated him to assist him with the petitioner's trial. Mr. Grant's performance in the petitioner's case is not challenged in the post-conviction petition. Mr. Grant conducted the petitioner's direct examination at trial as well as the examinations of a few other witnesses. Mr. Grant did not recall any conversation in which he or trial counsel had told the petitioner that he was facing 60 years in prison, and he was unaware of any plea offer that had been made in the petitioner's case. Mr. Grant testified that, on at least one occasion, he and trial counsel attempted to discuss the possibility of entering a plea, and the petitioner "was pretty adamant that he didn't want to talk about it."

Mr. Grant testified that he and trial counsel intended to proceed under a self-defense theory at trial and that he met with the petitioner several times in the weeks prior to trial. With respect to witnesses requested by the petitioner, Mr. Grant stated that their investigator interviewed the petitioner's son, and, following a lengthy discussion, he and trial counsel decided against calling him as a witness although he could not recall the specific reasoning. Mr. Grant recalled that their investigator had interviewed Mr. Bacon and reported that Mr. Bacon "was basically afraid of [the petitioner], and his testimony was not gonna be favorable to us."

With respect to the victim's character, Mr. Grant testified that the victim's criminal history showed that "he had been charged with some assault – I think an assault, and, maybe, a child abuse" but that he was never convicted, and the charges were dismissed. Mr. Grant recalled that the worst conviction on the victim's record was resisting arrest, a Class D misdemeanor, "which didn't help us out a lot." Mr. Grant stated that they had "heard rumors that [the victim] might have a bit of a[n] assaultive past, but we didn't find anybody that would testify to that."

Mr. Grant testified that he had "a pretty good relationship" with the petitioner and that, during his preparation of the petitioner for trial, he never saw the need to have the petitioner's mental health independently evaluated.

On cross-examination, Mr. Grant testified that he and trial counsel did not want the petitioner to mention the robberies at his house because they were concerned that "the jury would say that he shot [the victim] because he was mad about these property robberies." Mr. Grant testified that he and trial counsel "felt like [they] had [a] great self-defense claim." When asked if he wished he had done anything differently in the petitioner's trial, Mr. Grant admitted that he "would have liked to have found more witnesses, and we tried that, and

weren't able to," but that, given the facts and circumstances, he "felt [they] tried the case pretty well."

The petitioner's son, Kenneth John Meyer, Jr., testified that, at the time of the shooting, he resided with his father. On the night of the shooting, he was still awake when he noticed headlights that appeared to be "coming into our driveway." Mr. Meyer did not hear any gunshots and was unaware that anything had transpired until the petitioner entered the house and announced that he had just shot someone. Mr. Meyer told the petitioner to call the police.

With respect to the victim, Mr. Meyer stated only that he had "seen him a couple of times" and knew "he was wanted in several counties." Mr. Meyer testified that both trial counsel and trial counsel's investigator had spoken with him prior to trial, but they never called him to testify at trial.

Trial counsel testified that he was appointed to represent the petitioner several months prior to trial. Trial counsel testified that no plea negotiations took place and that the petitioner did not want to plead to anything. Trial counsel stated that he and Mr. Grant discussed the potential lesser included offenses to second degree murder as well as potential sentences.

Trial counsel testified that, after interviewing Mr. Meyer, they decided not to call him as a witness because his only useful testimony would involve the shots that were fired at his house while waiting for the police to arrive on the night of the shooting, and the trial court "had already ruled that he wasn't gonna let anything like that in."

Trial counsel's investigation into the victim's background revealed no felonies and only one or two misdemeanors. Trial counsel testified that the disagreement between the petitioner and the victim that had occurred a few days prior to the shooting came in at trial over trial counsel's objection because their trial strategy was to focus on self-defense rather than the victim as the first aggressor. When questioned as to why he did not want to address any first aggressor issues, trial counsel responded as follows:

I didn't think it would be helpful to get into that context.

Because there was some things in [the petitioner's] background that could have come out, that would probably have hurt us worse than us knowing – there was a point that [the victim] was first aggressor.

I think if those things would have come out, it was my
opinion that [the petitioner] would look worse than he did.

Trial counsel testified that he could not address the petitioner's claim that the victim had once run from the police because the trial court had granted the State's motion in limine to exclude any such testimony. Trial counsel also stated that he chose not to address character evidence in his appeal because he did not believe such a claim would have been successful.

With respect to the testimony of Mr. Bacon, trial counsel decided not to call him as a witness upon learning from his investigator that Mr. Bacon's testimony was not going to be favorable because the petitioner had threatened him. Trial counsel did not seek to have the petitioner's mental health independently evaluated because it "had already been determined," and he did not "feel there was a need to."

Trial counsel was aware that the petitioner had been involved in an automobile accident a few days before the shooting and that he had been charged with vandalism. Trial counsel chose not to mention it at trial because he believed it would make the petitioner appear aggressive. Trial counsel did not clearly recall whether the petitioner had been injured in the incident but stated that "[i]t didn't seem like it was one of those things that would affect anything."

When questioned about the 9-1-1 recording, trial counsel admitted that this court had, in its opinion, stated that the defense should have included a copy of the recording in the appellate record. Trial counsel explained that the recording had been "in two sections" because the petitioner's first telephone call had been disconnected, and he made a subsequent call. At trial, trial counsel sought to introduce both recordings under the rule of completeness, primarily so that the jury could hear the gunshots that were fired while the petitioner was waiting for law enforcement officers to arrive, but the trial court denied trial counsel's request to admit that portion of the recording. Trial counsel testified that he "thought we had proffered enough on that, that the Court of [Criminal] Appeals could consider that an issue" without including the entire recording in the appellate record.

With this evidence, the post-conviction court denied relief in an extremely thorough written order. With respect to the petitioner's contention that trial counsel failed to properly assert a theory of self-defense, the post-conviction court made the following specific findings:

[The petitioner's] assertions that defense counsel was
deficient regarding the claim of self defense are without merit.
The Court finds counsel's decision not to pursue the victim's

"extensive criminal record and violent tendencies" was correct since said proof could not have been established and simply could not be supported by the evidence. Further, there is no basis for ineffective counsel as to the failure to present further proof as to any inspections of the crime scene, investigator testimony, expert ballistic testimony, or expert toxicology testimony since no such significant evidence was available which could have been presented. Furthermore, counsel cannot be ineffective for failure to raise a defense of lack of mental competency since same is without sufficient support in the evidence. Finally, the Court finds that the remainder of [the petitioner's defense theory] allegations of trial counsel's failure to introduce evidence are not supported by the proof or were the result of legitimate trial strategy. Under any circumstance these errors do not raise a reasonable probability of a different outcome and therefore cannot support ineffective counsel error.

The post-conviction court also found that the "excluded portions of the [9-1-1] tape even if introduced would not cause this Court to have a reasonable doubt sufficient to undermine confidence in the verdict rendered by the jury."

On appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel failed to properly investigate and present at trial evidence of the victim's violent and aggressive tendencies; failed to file a written response to the State's motion in limine regarding the victim's character; failed to introduce evidence of the petitioner's injuries from his prior car accident; failed to call witnesses in support of the petitioner's self-defense theory; and failed to conduct an offer of proof with respect to the excluded portions of the 9-1-1 recording.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to relief via a claim of ineffective assistance of counsel, the defendant must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goud v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the post-conviction court's denial of relief. With respect to the petitioner's claim that trial counsel failed to properly investigate and present evidence of the victim's violent and aggressive tendencies, the petitioner has failed to present clear and convincing evidence of any such tendencies. Indeed, the petitioner's purported knowledge of the victim's character appears to be based on little more than rumor and conjecture. The petitioner's mere assertion that the victim was "a very dangerous man," coupled with the victim's alleged offhand remark that, if he were ever robbed, he would "take care of" the perpetrators, does nothing to further the petitioner's argument. Trial counsel testified that the victim's criminal history was devoid of any felony convictions and revealed only one or two misdemeanor convictions, the worst of which, according to Mr. Grant, was the Class D misdemeanor of resisting arrest. Mr. Grant testified that he and trial counsel had "heard rumors that [the victim] might have a bit of a[n] assaultive past," but they

were unable to locate anyone who was willing to testify to that effect. With respect to the petitioner's assertion that trial counsel should have pursued the theory that the victim was the first aggressor, trial counsel testified, and the post-conviction court accredited his testimony, that his trial strategy involved focusing on self-defense, primarily because he was concerned that addressing first aggressor issues would allow "things in [the petitioner's] background" to come into evidence, which he believed would have been detrimental to the petitioner's case. Such a reasonably-based trial strategy will not afford the petitioner the relief he seeks. *See Adkins*, 911 S.W.2d at 347. Moreover, the fact that the petitioner was charged with second degree murder but convicted of the lesser included offense of voluntary manslaughter indicates that the self-defense theory advanced by trial counsel carried some weight in the minds of the jurors.

The petitioner contends that trial counsel's deficient performance in failing to file a written response to the State's motion in limine prejudiced the outcome of his case. We disagree. Prior to trial, the State filed a motion in limine seeking to exclude any character evidence of the victim "until such time as the defense of self-defense is fairly raised by the proof." Although trial counsel did not file a written response, the trial transcript reveals that Mr. Grant was given the opportunity to respond during a hearing on the motion that occurred prior to the start of the trial. At that time, Mr. Grant and trial counsel agreed with the trial court's ruling that such evidence was inadmissible until fairly raised by the proof. We simply cannot see how trial counsel's failure to file a written response in this issue would have in any way altered the outcome of the petitioner's trial, considering that trial counsel provided an oral response to the motion before trial.

Regarding the petitioner's assertion that trial counsel should have introduced evidence of the injuries he received in an alleged automobile accident five days prior to the shooting, trial counsel testified that, although he was aware that the petitioner had been involved in an automobile accident a few days before the shooting and that he had been charged with vandalism in connection with the accident, trial counsel chose not to mention it at trial because he believed it would make the petitioner appear aggressive. Counsel could not clearly recall whether the petitioner had sustained any injuries in the incident but stated that "[i]t didn't seem like it was one of those things that would affect anything." The petitioner has failed to demonstrate how evidence of his alleged injuries would have altered the outcome of the trial.

The petitioner contends that trial counsel failed "to call any witnesses other than [the petitioner] who could have testified [o]n the [petitioner's] behalf in support of a self-defense theory." Although the petitioner requested that trial counsel call Mr. Bacon as a witness, both Mr. Grant and trial counsel testified that Mr. Bacon's testimony would have been unfavorable to the petitioner because Mr. Bacon was fearful of the petitioner and

-13-

reported that the petitioner had threatened him. The petitioner also complained that trial counsel failed to have him evaluated by an independent mental health provider. Both Mr. Grant and trial counsel testified that an independent evaluation would have been unnecessary, given that the petitioner's competency had previously been determined. Again, this court will not second-guess these reasonable trial strategies and tactical decisions. *See Adkins*, 911 S.W.2d at 347.

With respect to the excluded portion of the 9-1-1 recording, the petitioner argues that trial counsel failed to make an offer of proof at trial, which prevented this court from reviewing the issue of the exclusion on appeal. This court, however, cannot reach this claim because the petitioner did not enter the 9-1-1 recording as an exhibit at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that a post-conviction petitioner generally fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial). Thus, the petitioner failed to establish whether or how this recording could contribute to his defense.

We find no error in the findings of the trial court, and we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-14-